Last case for argument is Chase Manufacturing v. Johns Manville Corporation and we have an amicus in this case and we were unsure if counsel would prefer that appellant go first and amicus second, we'll take it either way that you want, how would you prefer to do that? Works for us. Okay, thank you. You're so far away over there. May I begin, Your Honor? Yes, please. May I please support Lukasz Kamp? Make sure you speak into the microphone, okay? I will do, Your Honor. Pull it in front of you. Appearing on behalf of Chase Manufacturing, Inc., which does business as Thermal Pipe Shields or TPS, I'll aim to reserve about three minutes for rebuttal. We're asking the court to reverse an erroneous grant of summary judgment and the dismissal of Thermal Pipe Shields two antitrust claims for monopolization and tying. It's a decision that was based on several key legal errors, some of which are uncontested, and the disregard of material evidence that was improper on summary judgment. For nearly 20 years, Johns Manville, the appellee defendant, had a complete monopoly in the market for calcium silicate or CalSil, a unique industrial insulation product. It's a modest part of Johns Manville's portfolio, but it's a very profitable one. And so when my client, Thermal Pipe Shields, sought to enter the market with a higher quality and lower priced CalSil, Johns Manville was motivated to respond, and it did in an anti-competitive manner. It refused to sell and threatened to retaliate against customers who did business with Thermal Pipe Shields. It tied the sale of its other products to the sale of its CalSil. Counsel, can I ask you about your section one tying claim? Yes, of course. What is the tying product? The tying product are Johns Manville's non-CalSil products, so everything... All of them? Yes, Your Honor. How is that a defensible position? I can't understand how we could proceed to analyze the section one claim without a proper definition of the tying product. So it's defensible because that is how Johns Manville framed the tie or the coercion here, and that's how customers understood it. Customers understood when they were threatened with this retaliation, when they were coerced by Johns Manville, that it put their entire relationship with Johns Manville at risk. Johns Manville did not frame the threats, the coercion, in terms of a specific product. It may have varied by customer. Of course, there's a great big breakdown in page 211 of Volume 6, which shows the different products that customers are buying. And so, short answer, it's defensible because that was the reality of the market, and that's what our... I guess I would like for you to help me write this, right? So if we're going to be writing a reversal on the tying claim, how have you established the appropriate elements to go forward on that claim? Yes, Your Honor. So the four elements... Our expert offered opinions on three of the elements, one, three, and four. The expert properly defines the market for CalSill, which is essentially what we need to do. The tying products then can be anything that's not CalSill. And I also think it's appropriate to point out that there aren't many other Johns Manville products functioning at issue here. Again, at page 211 of the sales, there's really functionally three other products that matter here. We're not saying those are the only three, but it's fiberglass, mineral wool, and perlite. Those are the big three products. InsulFin is a fourth industrial insulation product that Johns Manville sells, sold in pretty small amounts. But that's what customers need. Those are the products that customers are really turning to in that relationship with Johns Manville. And as the court has confirmed, you view the tie, the conduct, in the context of the market. And here, different customers had different needs, and that meant Johns Manville had different power over them. But you still have to show that JM had sufficient market power in the tying product market. So over each of those products that you just mentioned, you have sufficient economic power. Well, that's a point of contention, right? It is a point of contention, and I guess I'll take it on right now. Sufficient economic power is the standard, which is a distinct concept from market power and monopoly power. The district court correctly stated the standard as sufficient economic power, which that is a standard this court has stated repeatedly, including in I think the last two tying cases to come out of this circuit, Suture Express and in Ray Cox, 2017 cases, they stated the standard as sufficient economic power. District court stated that as the standard, but then proceeded to show or require, conduct a market power, even monopoly power analysis. The Supreme Court has said sufficient economic power is different from monopoly power, and it can be customer specific. It does not have to be market wide. This court in the sports racing services case from 97 affirmed that and noted that it is a considerably lower burden. That was this court's language in that decision. And I believe both Suture Express and in Ray Cox, the 2017 decisions from this court, cite sports car racing and foreign express enterprises and Jefferson Parish, the two other Supreme Court cases as imposing that standard. And so what we're looking for under that standard is simply whether Johns Mandel has some power over those customers to restrain competition in an appreciable way, to get them to do something they would not otherwise do. And that here is by Johns Mandel's lower quality product at a much higher price. That's all we need to show. I think to the extent we had to show market power, we do show that Johns Mandel has more than 40% market share in at least two of the other products, the fiberglass and expanded perlite. And on top of the power it possesses over specific customers, that would meet a market power standard. But that has never been the standard that this court has imposed. I made a point to you about our experts. Our expert offered evidence on most of the elements in this case. Monopoly power, harm to competition, and the bulk of the tying elements, all of those opinions survived Daubert. All of them. Johns Mandel did not appeal the denial of its Daubert motion. And so to the extent there are complaints or concerns about the work the expert is doing, they're not before this court. Wouldn't you agree that Mr. Warren Bolton's report was really focused on what would be the tied product? And wasn't he focused on the CalSilk market? No? Yes, I would, Your Honor. The bulk of the analysis, and I think that the bulk of the analysis goes to the monopolization claim. But he's providing a sufficient economic power analysis for the tying claim as well. But yes, Dr. Warren Bolton defined the product market. He showed that Johns Mandel had monopoly power. They could control prices, charge super competitive prices. He discussed the high barriers to entry in this industry. It's a concentrated market. There's two-player market. Thermal pipe shields is the only entrant in this market in the last 25 years. And it's a price inelastic product. And so yes, the focus was on calcium silicate. But the point I wanted to make was that that's all evidence. The minute those opinions are admitted, survived Albert, which they all did, it's evidence. And it was, to the extent there are complaints about it today, that's fact argument for the finder fact that it was inappropriate for the district court to disregard the evidence. There's evidence of Johns Mandel's ability to control prices. That's by definition monopoly power. That should have decided those issues. That alone. We had other evidence beyond our expert on harm to competition and monopoly power. But the expert evidence alone creates a triable issue of fact. To jump to the anti-competitive or exclusionary conduct portion of our monopolization claim, maybe the key issue in the case, and it's where the district court made the key error, the most egregious error, the most prejudicial error. It's the error that is prompting the government to participate as an amicus today. And it's an error that Johns Mandel itself concedes on page 34 of its answer brief. Johns Mandel states that it, quote, agrees that Novell's refusal to deal doctrine does not govern TPS claims here. The district court erroneously applied the refusal to deal with rival's doctrine to our entirely different claims. It, we stress that every step of the way that was not the standard that should apply. Indeed, the district court itself said, I know that's not the standard, but then proceeded to apply it anyway. The two big errors that, mistakes that flowed from that were the district court downplaying the threats or making this decision that threats alone weren't enough, that threats didn't matter unless Johns Mandel followed through. We offered evidence that, of instances, Johns Mandel did follow through on the threats, but that did not matter under the law. Threats pervert the competitive process. Threats get customers to do what they otherwise would not have do. They harm competition. It's the coercion that matters. We, this court in its 20, its decision from last summer in EpiPen emphasized coercion. That takes conduct that may otherwise be pro-competitive into an entirely different realm, and that was an exclusive viewing case, EpiPen was. There's nothing pro-competitive about coercion. What's your evidence on market share in CalSIL of the defendant? The defendant, Johns Mandel's 30B6 witness testified to that, testified to their 95% share of the CalSIL market. All right. What's the evidence on the market share of your client? Our client is the only other cell in the market, so our client has, I think, around 5%. All right. Roughly that. Is there any evidence as to market share of the defendant before your client entered the market? 100%. The district court found that. We're the only supplier. If I may reserve the remainder of my time for a while. Thank you. May it please the Court. Patrick Kuhlman on behalf of the United States. The defendant is now acquitted. As the parties now agree, the district court erred in applying Novell's test for refusals to deal with rivals to the alleged refusal to supply customers. Here the distributors are customers, not rivals. More important, Johns Mandel is not refusing to deal. It is dealing, but with an allegedly anti-competitive condition. Johns Mandel allegedly tells distributors that they can't buy CalSIL from TPS, and it's that condition, not a refusal to deal, that allegedly harms competition. We ask that this Court correct that error and make clear that when a monopolist imposes an anti-competitive condition, I'm sorry, when a monopolist refuses to deal in order to impose an anti-competitive condition, that is, a refusal to supply customers. Instead, a court would typically analyze that conduct under Section 2's general standard for anti-competitive conduct. And maintaining the proper boundaries of Novell's test is critically important because Novell imposed a purposely under-inclusive test because there's unique policy concerns surrounding requiring a monopolist to share its property with rivals. Novell's test should not be extended to other contexts, not raising those unique policy concerns. Counsel, I understand that the United States is here for a very specific purpose, and you don't take a position on either side. Is that right? That is correct. So we certainly can't decide cases in the abstract, right? So if you're asking us to articulate here today, why is this case a good vehicle to do that in? I think this Court, this is a good, this, the District Court's error was two-fold. The District Court applied Novell's test because to conduct involving not a rival conduct involving a customer, and it also involved, it also applied Novell's test to a situation where the harm came not from a refusal to share property with a rival, but rather the imposition of an anti-competitive condition. So we think it's important that this Court, no matter how it resolves this particular case, correct that error because if other courts were to apply Novell's test, there would be exceptions against monopolization. And another point I think I'd like to clarify is that a Court can find conduct anti-competitive without necessarily placing it in a box or attaching a particular label to it. The specific tests like the test for predatory pricing and the test for refusal to deal with rivals, those are the exception, not the rule. In most cases, in the typical case, a Court will apply the general standard for anti-competitive conduct, which is whether the conduct is the willful acquisition or maintenance of monopoly power. And the District Court in applying the test will place the conduct in a box. One other thing I'd like to clarify is that contrary to the suggestion in John Manville's brief, we're not here to advocate for a new legal framework. We're not asking the Court to apply a new test for conditional dealing to the alleged refusal to supply customers. Instead, what we're asking the Court to do is to, instead what we're trying to do is correct the District Court's error and we're explaining that when an anti-competitive condition is imposed on rivals, that conduct is not analyzed as under Novell's test. Well, in this context, setting aside the issue of whether there's a contract combination or conspiracy, are you then saying, are you then declining to opine on this as a freestanding Section 1 claim, but only in the context of a Section 2 claim against the rival who is injured by declining to deal with customers? Yes, Your Honor, correct. We're just addressing the application of Novell's test in the context of a Section 2 claim. We haven't addressed a Section 1 claim here. Thank you. And I see that my time has expired. Thank you. And we ask this Court to correct the District Court's errors and make clear that when a monopolist refuses to deal in order to impose an anti-competitive condition, that conduct is not analyzed under Novell's test. Thank you. May it please the Court, Greg Kerwin, appearing before Defendant Appellee, Johns Manville Corporation. TPS distorts evidence showing tough competition to claim some antitrust violation occurred here, but it cannot prove a violation under existing standards. It presented no evidence to show unlawful time, exclusive dealing, or refusal to sell to any distributor. And what it labels unlawful threats just reflect aggressive competition, including internal discussions within Johns Manville about how to compete and external discussions with distributors about promoting Johns Manville's products. So the Court should affirm. Let me go first to the Antitrust Division, because they've come all the way out here from Washington to critique our district judge's opinion. And I am very surprised that the government hasn't commented on the 11th Circuit and the 5th Circuit's approach in OJ Commerce from the 11th and the 5th and BRFHH, the decision we submitted last week through a Rule 20HA letter. Because exclusive dealing is what they're talking about. That's the theory for a conditional refusal and existing case law for exclusive dealing, including at issue here, which the plaintiff alleged, is perfectly sufficient. This Court has made it very clear in New Mexico Oncology and EpiPen that it doesn't just look at a mass of facts and say, is there an antitrust violation here? Instead, it looks at established theories. Theories that have been developed by courts, because antitrust is common law, over many years. And Judge Gorsuch's opinion in Novell points that out, that when there's an established theory, like predatory pricing, or exclusive dealing, or tying, that those are the theories that would apply. So it was absolutely appropriate for the district judge here to comment on TPS's refusal to supply claim. The DOJ doesn't understand what was happening in the trenches for two years, where TPS presented this claim and said, there's been a refusal to supply, and the district judge said, under what... So are you saying, Mr. Kerwin, that there is nothing wrong with somebody who has 75, excuse me, 95% of the market to threaten its customers, that they will cut them off, if they deal with the district judge's refusal to supply? The new entrant who has 5% of the market. There's nothing wrong with that? Only something wrong... So that's unilateral conduct, which this Court has said is generally not covered by Section 2. And to answer your question, there's nothing wrong as long as it is not exclusive dealing under the rubric that applies, including proving substantial foreclosure of rivals or tying. So you're saying that's okay, that hypothetical I stated? As long as it doesn't arise to exclusive dealing or tying, and your hypothetical, it didn't. Yes. That's competition. So somebody can go to a customer and say, if you deal, if you buy this other product from this new entrant, I'm not going to provide you with product, and you're just going to have to be dependent on getting the calcil from China. And you may not get these other products. Well, Your Honor, the test is whether there is substantial foreclosure. Since Tampa Electric in the Supreme Court, that's how the Supreme Court has analyzed that kind of scenario, where pressure is put on someone in an exclusive dealing context. And if a rival is effectively precluded because of the kinds of conduct you're talking about, and it's typically not mere threats, Your Honor, it's agreements. In EpiPen, this court singled out Denspley and McWane as extreme examples of exclusive dealing. Denspley was a case about artificial teeth, and the seller there precluded virtually every company that it worked with from selling competitors artificial teeth. It wasn't just threats. It was actual action. In McWane, it was distribution of pipe fittings, and the seller said, if you carry our competitors, then you can't work with us or you can't get our rebates. That's the kind of conduct that the exclusive dealing doctrine forbids. But, Your Honor, the guidance from the Supreme Court, we're talking about vertical relationships, not horizontal agreements among competitors, vertical relationships. Companies, like a manufacturer, like my client, have the freedom to build their distribution network in whatever way suits them. Under the Legion case from the Supreme Court, you could even tell your distributors, you cannot charge less than a certain price, resale price maintenance. For a long time, that was thought to be illegal, and the Supreme Court said, no, it isn't. Under Legion, you absolutely can tell customers what prices to charge. So vertical restraints, unless they arise to exclusive dealing or tying, which they clearly did not hear Judge Rossman's questions go to the very structure of the tying. And that includes vertical restraints that the customer may not like. You're talking about vertical relationships where the person with the large market share and the customer are in agreement. You know, OK, all right, I won't deal with these folks. I'll buy it all from you. Judge Murphy, if you don't mind, could we talk about the facts of this case in the context of your question? Because there's only two customers, two distributors, where you even have evidence of what they liked and didn't like. One very large distributor, the largest in the country. Yeah, the one said, DI, I think they said, we need their non-calcil product. Yes, and so what did they do? Johns Manville never discontinued its calcil product or any product with DI, and it was TPS's largest purchaser, buying more than $800,000 of calcil. So there's extensive... I looked at your chart. I thought the total sales were in the neighborhood of $400,000. Volume 6, page 211, which is... OK, let's look at your brief. Your brief. There's a chart. That's all right. Our brief summarizes it as well. Your Honor, that's the problem for TPS, is they claim they were foreclosed, but they weren't. They say there are five large distributors in the United States, and they sold substantial volumes to every single one of them. Is it actual foreclosure or likely foreclosure? Your Honor, I think it's actual foreclosure for purposes of exclusive dealing. What is the authority for that? Doesn't EpiPen refer to likelihood of foreclosure? I mean, what is the evidence that we need to be... What is the standard that we need to be marshalling here? Your Honor, I don't... If it is clear that foreclosure is going to happen, then I think courts can act, and I think that's where you're going with that. The standard for foreclosure is often based on percentages of who's excluded. Jefferson Parish is an example where the New Orleans hospital had 30% of the patients in New Orleans, and they were tying, in that case, anesthesiology services, and the Supreme Court found no violation, no foreclosure, no risk. Here, there is no foreclosure. There are no distributors that TPS can show were prevented from buying its calcil by anything Johns Manville did. And, in fact, during the almost... So your response is that even if they show... Well, you have to show absolutely no purchases by the customers, zero in order for the plaintiff to prevail. Judge Murphy, I'm not sure I understand your question. Well, what if they have diminished purchases from your client? Isn't that just as bad as absolutely no purchases from your... Excuse me. No purchases from the plaintiff? In theory, that could work, but there is zero evidence from any distributor saying they consciously chose to order less from thermal pipe shields because of some anti-competitive threat. Isn't there something just as good, which is we know what the market force is, and could a jury not find that, indeed, TPS's product was superior and cheaper? And then, of course, it's not a large jump to say, why wouldn't it exclusively use TSP? And the answer would be because it feared the consequences from JF. Well, Judge Phillips, there's a lot of conjecture in the hypothetical that you just presented that's not supported by the evidence here. When you say conjecture, what I'm really trying to get at is genuination of a material fact. Right. And if it falls within that, it may be conjecture, but that doesn't matter. It should be decided by a jury. And as I understand it, at least there's admissible evidence that TPS's CalSil is a superior product and that it's substantially cheaper. And so why could a jury not infer from that? Let's see, if I had my choice between these two and there weren't something going on, I'd choose that one every single time. In other words, you can show one instance where a distributor buys 50-50, I think. But back to Judge Murphy's point, don't the economic realities of those numbers show that, indeed, there is pressure that's being put on these distributors, and does that not matter legally? Judge, let me dissect your question if I can, and I'll try to address it in full. You started about whether TPS's CalSil is superior. They argue that what the distributors say is what matters most to them, is to be able to get it on time. The small distributor, Forestate, described TPS's inability to be on time as their downfall because they're bringing it in from China. Distribution International said they often need to supply a project within four to six weeks, and for them, availability was the key. So the fact that maybe theirs is a little less breakable or something like that doesn't make it superior in some undisputed way. On the big picture, which I think was also captured by your question, for a manufacturer to deal with a new competitor, they're allowed to compete aggressively, which they did here. They're allowed to respond. They're allowed to favor certain distributors who will get their product out to market. So distributors are just middlemen. They're middlemen. They're looking for a customer out there. And all of the distributors that Johns Manville works with carry multiple distributors' insulation. And at Judge Murphy, it's far broader than calcium silicate. It's hotly disputed about whether there are substitutes. So 100% market share is for this one set of molecules, but there are equivalent types of insulation that also substitute in the real world. The district court assumed, for the sake of argument, that gerrymandered market of 100% and monopoly power, but far from conceded. Judge Phillips, though, back to you. So you're saying there's a disputed issue of fact with the trial court? The trial judge, for summary judgment, assumed the market definition and market power that the plaintiff advanced, and that's why we're here. You concede that there is evidence of 95% market share. If the market is limited to calcium silicate only, yes. But to violate the antitrust laws, a monopolist, if that's what you are with 95%, has to do affirmatively bad things. And they had three theories on get to refusal to supply, which really is exclusive dealing. But exclusive dealing requires substantial foreclosure of the market. And, Judge Rosman, that means showing that there are specific distributors who were blocked because of the exclusivity required by the manufacturer. There's no evidence of any contractual exclusivity, so it all has to be implied. And the biggest distributor, Distribution International, 40% of the market, absolutely was not foreclosed. They bought Thermal Pipe Shields Calcil until their factory got shut down in 2021. As an alternative, they also bought both. The second distributors to whom we have deposition testimony, Forestate bought from both. They were not foreclosed. The way, after two years of discovery, the way Thermal Pipe Shields built the evidence here, they didn't talk on the record with any other distributors. So you have no other evidence of any kind of foreclosure. You do have sales data, which is volume six, page 211 from Plaintiff's own expert, showing large purchases from Thermal Pipe Shields from other big distributors, SPI, Bay, General, MacArthur. So there's no foreclosure here. There's some debate within the case law about what percentage is required for foreclosure, and maybe that's where you were coming from, Judge Rosman. But here, there is no foreclosure. So whatever they could prove, and with all these e-mails and things about supposedly implied exclusive dealing, they can't prove the elements of that theory as well established by this Court's precedence and others. How did the rebate agreements fit in? The rebate agreements were with two large distributors, Distribution International, SPI, and they provided a small additional discount of a percent or two on products. And the evidence is undisputed. TPS was selling for 25% below. So in evaluating whether a rebate agreement somehow excludes rivals, you look at whether the purchaser is somehow influenced to not work with the rival. And as the district judge recognized here, a percent or two discount for a big distributor like DI or SPI wasn't going to influence a buyer that was concerned about cost. They could buy TPS's CalSil for 20% or 25% less. Just to finish the big picture, going back to your question, Judge Phillips, the only other antitrust theory is tying. And as Judge Rossman pointed out at the very beginning, there's no structure. There's no tied product defined. There's no market power defined in Judge Phillips in the way that your decision in Cox explained it. Absolutely, there must be proof of market power in the tying product. They don't even define the tying product to be able to carry out an analysis of what the market power would be. And they also don't define any tying arrangement. How much specificity would it need to be sufficiently defined? How much specificity? I'm sorry, I missed the beginning. What are the tying products? We've heard some that have been listed, but at the same time we hear from distributors that it couldn't do business without John Manfield. And so it's obviously contemplating that there are products out there that it needs. And I don't know that that's a big universe of products. In other words, does everybody know exactly what they're talking about, even if they're not itemized? No, that's the problem, Your Honor. The complaint alleged two tying products. They're supposed to show that there are no substitutes, and that's a unique market in which the seller has market power to force purchases. That's the element of tying. And it's been a moving target from the original complaint to summary judgment to now. And non-CalSIL products doesn't tell you what they're talking about. And if they want to cherry pick Perlite versus fiberglass, if those are substitutes, then when you analyze market power you have to treat them together under Ohio versus American Express. So it doesn't work to come in with this flimsy market definition of it's everything else you sell, which is what they do. And as Judge Wasserman pointed out, you can't even begin to do tying analysis based on that, let alone market power to force. And the other TPS commented about what the standard would be. In their briefs they go to ancient Supreme Court case law like Northern Pacific and Fortner, which had a very lax standard for market power in tying. And, Judge Phillips, your decision in Cox, the cable case, points out that the Supreme Court is very clear about what's required, and it's part of what you have to show as an essential threshold for a tying claim, which is market power in the tying products, assumed they're defined. It isn't just that customers value it, or they use the terminology, or their expert uses must have. That's not the standard for market power. As Ohio versus American Express from the Supreme Court makes clear, market power is a very specific analysis taking into account practical realities. One of which is the ability to set prices or exclude competition. And if you have somebody who can charge much more than their rival, that at least has evidence that they have a better product, doesn't that suggest the ability to set prices? Not necessarily, Your Honor. Your Honor, when you talk to the customers. But, see, we're not talking about necessarilies now, because we're in summary judgment, and the question is whether there's a genuine issue of material facts. The price, you focused on the price difference between Johns Mansfield's prices and Thermopyte Shields. I'm ready to go to the Canadian prices, too. The expert opined on Canadian prices, and he cherry-picked some markets, some foreign markets, but not others. I didn't cherry-pick, you know. Wasn't there a demonstration that they had to charge less in Canada for the CalSil product because it was more formidable competition there? There's an allegation from the expert. Isn't there evidence of that? There is expert analysis of that. So what you're talking about was used to opine on monopoly power. Monopoly power was undisputed for summary judgment here, Judge. So, yes, their expert goes off and he says this price difference and margins and all these things prove monopoly power. So that part of the case, though, monopoly power. So the only question is, in my memory, I'm going many, many decades ago, is that you have monopoly power plus. And if you do, then you have a monopolization claim, and the plus is conduct that is exclusionary. Exactly. Whether it has a talisman label or not, if it's exclusionary and you have that kind of ability to set prices, there's a problem under Section 2, isn't there? My time is almost up. Let me briefly respond, Your Honor. So the summary judgment ruling here is only about exclusionary conduct for purposes of summary judgment, but not trial if we get there. Monopoly power and market definition in CALCIL, not tied products, was undisputed for purposes of summary judgment only. So to talk about differences in prices and so on to prove monopoly power doesn't matter. A monopolist has to engage in exclusionary conduct, and all the discussion in summary judgment was, does Thermal Pipe Shields have evidence to prove that? They don't under the existing theories of refusal to supply, which has no support other than DOJ's general principles with no authority presented to you. None for exclusive dealing, as I've talked at length, because there's no substantial foreclosure. And none for tying because they don't even begin to define the tying products, much less market power in a tying product, much less proof of a tying arrangement. I'm out of time. Thank you for your attention to this case. Thank you, Your Honors. To address several of the points that were made, on the foreclosure point, I'd point the court to the 2014 decision, Lennox-McClaren Surgical. It addresses the idea of simply eking out some sales, breaking through, whether that's enough. This court said there, there were several entrants that managed to break through, make more sales than Thermal Pipe Shields has managed to make here, and yet this court said there were tribal issues of fact on that question. Relating to the foreclosure, we offered evidence that John's man built threatened or coerced at least nine of those customers that amounted to 86% of the market. 86% of CalSol purchase was purchased by customers who were threatened by John's man built. That is significant. I'd also cite the court on the idea of this superior product and higher price, lower price point. Volume 7 at page 91 to 112 is an excellent PowerPoint presentation. Internal document by John's man built. I won't discuss the specifics because it's under seal, but it addresses the emerging threat in the CalSol market. It's a few months after my client has entered the market. They know their product is of inferior quality. They know it's overpriced, and they know they need to improve on those things, innovate to remain competitive, otherwise they're going to lose significant market share. They don't do any of that but maintain 95% of the market. Finally, to address this 5th Circuit, 11th Circuit issue that's emerged, that's a new argument that John's man built did not make before the district court. Slapping on the exclusive dealing framework to threats coercion does not make sense. There are these categories of cases that have emerged that handle some conduct that is typically potentially pro-competitive where courts want to tread lightly. Exclusive dealing is an example of that. Here you ask Judge Murphy the question, what's pro-competitive about threats? What's pro-competitive about coercion? There's nothing. It harms customers. It only serves to protect John's man built monopoly, thus it doesn't make sense to apply that framework. My time is up. We're simply asking the court to apply the correct standards, consider all the evidence, and let a jury decide these issues. Thank you very much. Thank you, counsel, for your arguments. The case is submitted. Counsel are excused, and the court stands in recess until 9 in the morning.